### T. B. TOWNSEND BRICK & CONTRACTING CO. v. CENTRAL TRUST CO. OF NEW YORK et al.

(Circuit Court of Appeals, Sixth Circuit. April 19, 1911.)

No. 2,074.

1. RAILROADS (§ 75*)—POWERS—USE OF STREETS BY RAILROADS—OHIO STATUTE—"MANNER, TERMS, AND CONDITIONS."

Under Rev. St. Ohio 1880, §§ 3270, 3281, 3283, which invest railroad companies directly with the right to appropriate and use the streets of a city for railroad purposes by condemnation proceedings, unless the company and the municipal authorities agree "upon the manner, terms, and conditions upon which the same may be used or occupied," construed in the light of the settled rule in Ohio that municipal corporations possess such powers only as are expressly granted by statute or are implied as essential to the exercise of granted powers, and of section 3375, authorizing railroad companies for hauls of less than 30 miles to receive such rates as may be from time to time fixed by the company or by law, the power given to a municipal corporation by section 3283 to agree upon the manner, terms, and conditions upon which streets may be used is limited to such agreement as relates directly to such use and occupation, and a provision in an ordinance prescribing rates to be charged by a belt line road for hauls over its entire line, less than 30 miles long, as a condition to granting right of way over the streets for a part of its line, is ultra vires and void.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 75.*

For other definitions, see Words and Phrases, vol. 5, pp. 4333–4337.]

2. RAILROADS (§ 75*)—USE OF STREETS.

Where, under the state statute, a railroad company is authorized to occupy and use the streets of a city independently of municipal consent, and where the city in granting its consent has sought to affix a condition in the interest of its own inhabitants and all other patrons of the railroad company, which is beyond the scope of its authority, in an action brought by an individual claiming the benefit of this provision, the railroad company is not estopped from relying on the ultra vires character of the provisions as a defense.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 75.*]

3. CARRIERS (§ 12*)—CONNECTING CARRIERS—SWITCHING CHARGES—OHIO STATUTE.

Rev. St. Ohio 1908, §§ 3340, 3341, which provide that when the tracks of two railway companies connect, and the tracks of one lie contiguous to coal mines, manufacturing establishments, etc., it shall be the duty of such company on request to switch the cars of other companies on to such tracks and move the same to such coal mines, etc., to be loaded or unloaded, and fixing maximum rates per car which may be charged to the companies from whom the cars are received for such service within the terminal limits of cities and towns, provided that nothing therein shall require any company to furnish its terminals and facilities at such rates

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to any other company which shall not afford similar terminals and reciprocal facilities, relate only to the charge which such railway companies may make each other for switching services in the delivery of incoming freight which one receives from the other, and create no right of action against either of the companies in favor of individual shippers, if the switching charge is in excess of that provided.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

Suit in equity by the Central Trust Company of New York, trustee, against the Wheeling & Lake Erie Railroad Company. The T. B. Townsend Brick & Contracting Company filed a petition of intervention against both parties, the Zanesville Belt & Terminal Company, and B. A. Worthington, receiver of defendant company. From a decree dismissing such petition on demurrer, it appeals. Affirmed.

Winn & Bassett, for appellant.

Joline, Larkin & Rathbone, Hoyt, Dustin, Kelly, McKeehan & Andrews, and Squire, Sanders & Dempsey (W. M. Duncan and W. B. Sanders, of counsel), for appellees.

Before SEVERENS and KNAPPEN, Circuit Judges, and SANFORD, District Judge.

SANFORD, District Judge. This is an appeal by the T. B. Townsend Brick & Contracting Company, from a decree of the Circuit Court dismissing on demurrer an intervening petition filed by the appellant in an equity cause therein pending entitled Central Trust Company of New York v. Wheeling & Lake Erie Railroad Co.

The material averments of this intervening petition, which was filed January 20, 1910, are: That the petitioner is an Ohio corporation located in the city of Zanesville and engaged in the manufacture, sale, and shipment of brick. That the line of railway of the Zanesville Belt & Terminal Company, an Ohio corporation, hereinafter designated as the Belt Line, is contiguous to the manufacturing establishment of the petitioner and other manufacturing establishments in and about said city, and connects with other lines of railway entering or passing through said city, and that said Belt Line has been used solely for switching and transporting cars between such manufacturing establishments and lines of connecting railway; the distance from such manufacturing establishments to the points of connection with other railways being less than four miles. That under an arrangement between said Belt Line and the Wheeling & Lake Erie Railroad Company the said Belt Line has been for a long time controlled and operated by said railroad company and is now being controlled and operated by the receiver appointed in said equity cause. That said Belt Line was constructed about the year 1887 by two railway companies of which it is a successor. That it passes along and crosses various streets in said city. That the right to use such streets was granted to said original railway companies by various ordinances of the city council, and especially by an ordinance passed January 10,

1887, granting a right of way over certain streets of the city subject to the conditions, stipulations, and limitations expressed in the following clause:

"Said railway company, its successors and assigns shall have the right to fix and determine the price and charge for hauling all cars over the railroad constructed on the rights of way herein granted, but in no case shall the price or charge exceed two dollars per car (empty cars to be carried free), and each loaded or partly loaded car hauled from any other railroad shall be construed and held to be a haul within the meaning of this ordinance."

That said $2 rate was intended to apply through the entire Belt Line as one haul and one road. That said ordinances were duly accepted by said railway companies, and said Belt Line was constructed partly upon the right of way granted by said ordinance of January 10, 1887, and partly on the rights of way granted by said other ordinances, and that all switching and movement of cars between petitioner's manufacturing establishment and the points of connection with other railway lines move over a large portion of the right of way granted by said ordinance of 1887. That for a long time prior to January 1, 1910, a $2 rate for hauling and switching on said Belt Line was in effect, which more than covered the cost of said service, but that the Wheeling & Lake Erie Railroad Company and its receiver had put in effect on January 1, 1910, a tonnage rate of 10 cents per ton, which was largely in excess of the $2 per car rate provided in said ordinance of 1887, and that the several other railways connecting with said Belt Line had refused and would continue to refuse to absorb such switching charge upon shipments of freight over their several roads in so far as the same is in excess of $2 per car, and that the petitioner would be put to largely increased expense, both as to freight received and shipped by it. And that under sections 3340 and 3341 of the Revised Statutes of Ohio of 1908 any railway company owning a track contiguous to a manufacturing establishment within the terminal limits of or about any city is required to switch the cars of connecting railway companies at the request of such company, or the shippers, over and upon its tracks for the purpose of loading freight, and is entitled to receive from the companies whose cars are so switched, loaded and unloaded, not more than $2 per car for switching all distances over two and one-half miles and not exceeding five miles, with no charge for returning empties from said manufacturing establishment.

The petitioner prayed that an injunction issue commanding said Belt Line and said the Wheeling & Lake Erie Railroad Company and its receiver to refrain from maintaining said increased tonnage rate for switching on said Belt Line, and requiring them to haul all freight cars upon said Belt Line between petitioner's manufacturing establishment and connecting railway lines at not exceeding $2 per car, and that they be restrained from attempting to collect from petitioner any charge in excess of the rate of $2 per car, as provided by the laws of Ohio and by said ordinance of 1887, and be required to comply in all respects with the conditions and limitations contained in said ordinance.

The Belt Line, the Wheeling & Lake Erie Railroad Company, and its receiver and the Central Trust Company of New York demurred to

187 F.—5

this petition as stating no cause of action. These demurrers were sustained and the petition dismissed.

The appellant contends, first, that the increased tonnage rate charged is a violation of the condition under which the right of way to occupy the streets of the city was granted by the ordinance of 1887, and that the acceptance of this ordinance constituted a contract obligation which cannot be disregarded by the Belt Line while it uses and maintains said right of way; and, second, that said increased rate is a violation of the provisions of the Revised Statutes of Ohio fixing a switching rate of not exceeding $2 per car upon hauls of this distance.

1. The validity of the ordinance of 1887 is to be determined by a consideration of various provisions of the Revised Statutes of Ohio of 1880, which were then in force.

By section 3270 of these Revised Statutes every railway company is authorized to construct, maintain, and operate its railway "between the points named in the articles of incorporation, commencing at or within, and extending to or into any city, village, town or place named as a terminus of its road."

By section 3281 the company is authorized to enter upon any lands and appropriate so much thereof as may be necessary for the railroad, subject to the obligation of making full compensation therefor as prescribed by law.

By section 3283, upon which the appellant bases its argument as to the validity of the ordinance of 1887, it is provided that:

"If it be necessary, in the location of any part of a railroad, to occupy any public road, street, alley, way, or ground of any kind, or any part thereof, the municipal or other corporation, or public officers or authorities, owning or having charge thereof, and the company, may agree upon the manner, terms and conditions upon which the same may be used or occupied; and if the parties be unable to agree thereon, and it be necessary, in the judgment of the directors of such company, to use or occupy such road, street, alley, way or ground, such company may appropriate so much of the same as may be necessary for the purposes of its road, in the manner and upon the same terms as is provided for the appropriation of the property of individuals, but every company which lays a track upon any such street, alley, road, or ground, shall be responsible for injuries done thereby to private or public property lying upon or near to such ground which may be recovered by civil action brought by the owner, before the proper court, at any time within two years from the completion of such track."

This section of the Revised Statutes was derived from section 12 of the Ohio incorporated companies act of May 1, 1852 (section 12, 50 O. L. pp. 274, 277).

By section 3375 of the Revised Statutes of 1880, relating to railway companies, which was derived, with certain changes, from section 13 of the act of May 1, 1852, it is provided that:

"Such company may receive for transportation not exceeding five cents per ton per mile when the same is transported a distance of thirty miles or more, and in case the quantity transported is less than one ton in weight or any quantity is transported a less distance than thirty miles, such reasonable rate as may be from time to time fixed by the corporation or prescribed by law."

The appellant earnestly contends that the rate ordinance of 1887 is a valid contract between the city and the railroad company under

the authority given the municipal authorities and the company by section 3283 of the Revised Statutes of 1880 to "agree upon the manner, terms and conditions" upon which the streets "may be used or occupied," and that this section rightly construed "delegates to the municipality the power to impose any conditions, whatever their nature may be, which the city may deem proper, leaving the alternative that if the conditions are not acceptable the grant may be obtained in another way, namely, by condemnation proceedings." The appellees insist, upon the other hand, that under a proper construction of this section the scope of the agreement between the municipal authorities and the company must be limited "to the character of the occupation or the use" which the company is permitted to make of the particular portion of the street, and that so much of the ordinance as attempted to fix the rate to be charged over the right of way granted by this ordinance and other portions of the Belt Line right of way not included in this ordinance is ultra vires and void.

There appears to be no direct authority upon the question of the proper construction of the words "manner, terms and conditions," as used in section 3283 of the Revised Statutes.

On the one hand, the decisions of this court in Detroit Citizens' Ry. Co. v. City of Detroit, 64 Fed. 628, 12 C. C. A. 365, 26 L. R. A. 667, and Mayor of Knoxville v. Africa, 77 Fed. 501, 23 C. C. A. 252, and other similar cases, such as Southern Bell Tel. & Tel. Co. v. City of Richmond (4th Circuit) 103 Fed. 31, 44 C. C. A. 147, upon which the appellant relies, involving the construction and effect of statutes forbidding the use of the streets of a city by a street railway company, except by the "consent" of the city authorities, deal with questions materially different from that now under consideration. And it is clear that the incidental statement in the opinion of this court in Louisville Trust Co. v. City of Cincinnati, 76 Fed. 297, 312, 22 C. C. A. 334, 340, that "no reason occurs why an ordinary railroad desiring to pass its cars through the streets of a city might not be required, as a condition of street occupancy * * * to carry passengers in such cases at a low rate" was purely obiter, this question not being in any manner involved in the case, which, so far as the question of municipal consent was concerned, related solely to the validity of an ordinance limiting the duration of a street railway franchise in the streets of a city; nor was consideration given by the court in this opinion to the several provisions of the Ohio Statutes involved in the determination of the present question, nor to the previous decision of the Supreme Court of Ohio in Ravenna v. Pennsylvania Company, 45 Ohio St. 118, 12 N. E. 445, indicating the public policy of the state in reference to municipal corporations and the restricted authority given them in the regulation of railroad companies under the rule of strict construction stated in that case and reaffirmed in the subsequent case of Townsend v. City of Circleville, 78 Ohio St. 122, 84 N. E. 792, 16 L. R. A. (N. S.) 914.

And on the other hand it is equally clear that the cases of State v. Telephone Co., 72 Ohio St. 60, 74 N. E. 162, and Farmer v. Telephone Co., 72 Ohio St. 526, 74 N. E. 1078, upon which the appellees

rely, involving the validity of ordinances fixing the rates of telephone charges, are not controlling of the question at issue, in view of the fact that the power of agreement between municipal authorities and telephone companies extends, by the language of the statutes relating to such companies, only to the "mode of use of the streets." Revised Statutes of Ohio of 1908, §§ 3461, 3471.

We come, then, in the absence of direct authority, to the consideration of the scope and effect of section 3283, in the light of the other sections of the Revised Statutes of 1880 in pari materia, in connection with which it is to be read.

In these provisions it appears, in the first place, that the Legislature of Ohio has not delegated to the municipal authorities the power to grant a right of way in the public streets which resides primarily in the Legislature, and has not made such right of way subject to the consent of the municipal authorities, as in the statutes under consideration by the court in the Detroit and Knoxville cases, supra, but, on the contrary has, under sections 3270, 3281, and 3283, directly invested railway companies with the right to appropriate and use the streets of a city for railway purposes, and with the power to exercise this right in default of an agreement with the municipal authorities through condemnation proceedings. See by analogy State v. Telephone Co. and Farmer v. Telephone Co., supra, 72 Ohio St. 60, 74 N. E. 162, and 72 Ohio St. 526, 74 N. E. 1078. The only authority given by the statutes to the municipal authorities in this matter is that conferred by section 3283, namely, that of agreeing with the railway company upon the "manner, terms and conditions" upon which the streets "may be used or occupied." This right is, it is conceded, to be construed in the light of the well-settled principle that municipal corporations in Ohio, in their public capacity, possess such powers only as are expressly granted by statute or may be implied as essential to carrying into effect the powers expressly granted. Ravenna v. Pennsylvania Co., 45 Ohio St. 118, 12 N. E. 445; Townsend v. City of Circleville, 78 Ohio St. 122, 84 N. E. 792, 16 L. R. A. (N. S.) 914. Construing, then, the language of section 3283' in the light of this principle and giving to its language its obvious and natural meaning, especially in view of section 3375, giving railway companies the right to receive such reasonable freight rates as may be from time to time fixed by the company or prescribed by law, we have reached the conclusion that the authority given the municipality and the company by section 3283, of agreeing upon the manner, terms, and conditions upon which the streets of a city may be used and occupied, must be construed as extending only to such agreement as relates directly to such use and occupation of the streets, such as the portion of the streets which shall be occupied, the manner in which the railway shall be constructed, the regulations affecting its use in the interest of public safety and convenience, the character and maintenance of the roadbed, the repair of the streets rendered necessary by the construction of the railway, and compensation to the city for injury done by its construction and operation to other public property, and that it was not intended by this section to authorize the city and the rail-

way company to enter into an agreement as to a purely collateral matter, such as the rate of compensation to be charged by the railway company for hauling passengers and traffic over the streets involved or over other portions of its right of way.

We are led to this conclusion primarily by the natural and plain meaning of the language used in reference to the use and occupation of the streets; by the fact that in another section of the Revised Statutes, as above stated, express authority is given the railway in the matter of fixing reasonable rates from time to time except as otherwise prescribed by law, a provision which, in our opinion, operates to exclude by implication the matter of rates from the terms of the agreement contemplated by section 3282; and by the further fact that, if resort were had by the railroad company to condemnation proceedings in default of an agreement with the municipal authorities, it is obvious that the right of condemnation could not be conditioned upon terms prescribing the rates to be charged by the railroad company, but the right of way would be acquired subject only to the exercise of the valid police power of the municipality. We are strengthened in this conclusion by the fact that section 3283 gives the same power of agreement to other public officers having charge of public grounds that it does to the municipal authorities, and it surely could not have been intended that such other officers, having no legislative functions whatever, should be authorized to enter into valid agreements in reference to the rates to be charged by the railway companies whose roads should cross the public grounds in their charge. Furthermore, in view of the fact that section 3283 applies generally to commercial railway companies, which, in most instances, extend through many municipalities, we do not think it could well have been intended by the Legislature that each separate municipality should have authority to agree with a company as to the rates to be charged through its particular borders, thereby leading to great confusion in the establishment of through rates, and, a fortiori, that it could not have been intended to authorize a municipality agreeing to the use of certain streets to fix as a condition the rates to be charged, not only over such streets, but also over other streets not involved in the agreement—as is alleged to have been done under the ordinance in question—and still less to prescribe as a condition the rates to be charged by the railway over its entire line, a result to which the appellant's argument would, it seems, logically lead. Furthermore, if the municipality and the railway company may broadly "agree" upon the rates to be charged, they might not only agree upon the maximum rate to be charged, but might, also, as was sought to be done in the present case, authorize the rate to be charged, or they might, by agreement, fix a definite rate which might and should be charged. We do not think that such broad power was intended to be vested in the municipal authorities and the railway company under the semblance of an agreement as to the manner, terms, and conditions upon which the streets might be used and occupied.

For these reasons, therefore, we conclude that the section of the ordinance in question attempting to prescribe the maximum rates

which might be charged by the Belt Line for transportation of freight over the streets named in the ordinance and other rights of way embraced in other ordinances was in excess of the authority conferred by section 3283 of the Revised Statutes and ultra vires and void.

2. The appellant insists, however, in the alternative, that, even if this provision of the ordinance be in excess of the statutory authority, nevertheless, as it was accepted by the railway company under this condition, it cannot, so long as it enjoys the benefit of the ordinance, escape performance of the prescribed conditions on the ground of its invalidity.

It is unnecessary to determine what would be the relative rights of the parties upon this theory in litigation directly between the railway company and the city in its proprietary capacity, under the rule stated in Southern Bell Tel. & Tel. Co. v. City of Richmond (4th Circuit) 103 Fed. 31, 44 C. C. A. 147, and Southern Pac. Co. v. City of Portland (C. C.) 177 Fed. 958, and other similar cases upon which the appellant relies, or to determine to what extent the rule laid down by this court in the recent case of City of Memphis v. St. Louis & S. F. R. Co., 183 Fed. 529, would be applicable, in case the railway company had not been vested with direct legislative authority to use the streets of the city, and were compelled to rest its rights thereon solely upon the consent given by the municipal authorities under the ordinance of 1887. Without, therefore, passing upon these questions, we have concluded, after careful consideration, that in a case such as the present, where, under the state statute, the railway is authorized to occupy and use the streets of the city independently of the municipal consent, and where the city in granting its consent has sought to affix a condition in the interest of its own inhabitants and all other patrons of the railway company, which is beyond the scope of its authority, in an action brought by an individual claiming the benefits of this provision, the railway company is not estopped from relying upon the ultra vires character of such provision as a defense. This holding is in direct accord with the decision of the Supreme Court of Ohio in Farmer v. Telephone Co., supra (72 Ohio St. 526, 532, 74 N. E. 1078), in which it was held that where a municipality in Ohio had sought by ordinance to fix the rates to be charged for telephone exchange service within the city limits, such provision being ultra vires and beyond the authority of the municipality, individual citizens were not entitled to "take advantage of a nude pact to raise an estoppel, a pact to which they were in no wise parties, or privies in the eye of the law, and against a party with whom they had no contract or other legal relations whatever themselves," and were therefore not entitled to a mandatory injunction to enforce compliance with such provision of the ordinance.

3. The appellant further contends that the tonnage rate in question is in violation of sections 3340 and 3341 of the Revised Statutes of Ohio of 1908.

Section 3340 provides that when the tracks of two railway companies connect, and "the tracks of one company lie contiguous to coal mines, stone quarries, manufacturing establishments, elevators, ware-

houses, navigable waters or side tracks, suitable for loading or unloading, it shall be the duty of such company to switch the cars of other companies, at the request of such companies, or the shippers, over and upon the tracks so lying by such coal mines, stone quarries, manufacturing establishments, elevators, warehouses, navigable waters or side tracks, for the purpose of unloading or loading grain or other freight into or from such elevators, warehouses, boats upon said navigable waters, or side tracks.   *   *   * "

Section 3341 provides that:

"When the tracks of two companies are connected as aforesaid, either company shall. when required, transport over its road to its destination thereon, any freight offered, in the cars in which it is offered, at its local rates per mile as set forth in the company's freight tariff for the distance most nearly corresponding, and return the cars, with or without freight, without unnecessary delay; and any company owning a track or tracks lying contiguous to coal mines, stone quarries, manufacturing establishments, elevators, warehouses, navigable waters or side tracks as aforesaid, and within the proper terminal limits of or about any city or village, shall be entitled to receive from the company whose cars are so switched, loaded and unloaded at such coal mines. stone quarries, manufacturing establishments, elevators, warehouses, navigable waters or side tracks, no more than one dollar per car for switching one-half mile or less on such tracks;  *  *  *  and for all distances over two and one-half miles and not exceeding five miles, the charge shall not be more than two dollars per car;  *  *  *  and there shall be no charge for returning empty cars from said coal mines. stone quarries, manufacturing establishments, elevators, warehouses, navigable waters or side tracks;  *  *  *  provided further, that nothing herein contained shall require any railway or railroad company now in operation to furnish its terminals and facilities at the rates herein named, to any similar company or any railroad to be built by it hereafter which shall not afford similar terminals and reciprocal facilities."

The petition alleges that, while the railway companies with whose line the Belt Line connects have always afforded the Belt Line their terminal and reciprocal facilities, the Belt Line itself owns no equipment except a locomotive used for switching purposes, and has no terminal facilities of its own.

Construing the foregoing provisions of the statutes, we think it clear that section 3341 is only intended to apply in the case of connecting railway companies affording each other similar terminals and reciprocal facilities; that it is designed solely for the benefit of such railway companies in their exchange of business and relates only to the charge which such railway companies can make each other for switching services in the delivery of incoming freight which one company receives from the other and the return of the empty cars; and that it creates no right of action whatever against either of the companies in favor of any individual shippers. As applied to the present case, it can, at the most, have reference to freight coming in on the lines of connecting railway companies and delivered by them to the Belt Line for switching and unloading at the manufacturing establishment of the appellant, and, even as so applied, it relates only to the switching charge which the Belt Line can make against the other railway companies for the switching and unloading of such freight and the return of the empty cars, and gives a right of action in favor

of such other railway companies alone, if the switching charge is in excess of that provided by law.

In so far as the rights of the individual shippers, such as the appellant are concerned, we are constrained to conclude that if the aggregate rate charged by such other railway companies for hauling and delivering the freight, including the switching charges, are unjust and unreasonable the remedy of the shippers must be found in proper cases by due application for the enforcement of the provisions for the benefit of shippers which are contained in the Ohio Railroad Commission act and the interstate commerce act and their amendments.

We therefore conclude that there was no error in the action of the Circuit Court in sustaining the demurrers to the intervening petition and in dismissing the same. The decree of the court below will accordingly be affirmed and the appeal dismissed, with costs.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes